Russell Greer
3930 University Center
Apt 103
Las Vegas, NV 89119
801-895-3501
russmark@gmail.com
Pro Se Litigant

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| **RUSSELL GREER**,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>**FRANCISCO V. AGUILAR,**<br><br>Defendant-Appellees | **APPELLANT'S OPENING BRIEF FOR PRELIMINARY INJUNCTION APPEAL**<br><br>9th Cir. Case No.: 26-6311<br><br>District Court Case No. 2:25-cv-02581-JAD-BNW |

# TABLE OF CONTENTS

*Page*

**I. JURISDICTIONAL STATEMENT** .......... 2

**II. ISSUES PRESENTED** .......... 2

**III. STATEMENT OF THE CASE** .......... 3

A. Nevada requires five local public sponsors before a local initiative may circulate. .......... 3

B. Appellant spent years attempting to satisfy the five-person requirement. .......... 4

C. Independent UNR volunteers encountered the same practical barrier. .......... 4

D. The record distinguishes support for reform from willingness to become a public sponsor. .......... 5

E. Appellant alleged concrete evidence explaining the reluctance of many to become public sponsors. .......... 5

F. Existing organized networks can satisfy the requirement in a way lack of existing networks cannot. .......... 6

G. The March 3rd order characterized the burden as minimal. .......... 7

H. The court treated the additional four sponsors as a "gatekeeping" mechanism for grassroots support. .......... 7

I. Appellant sought reconsideration and identified controlling factual differences. .......... 7

J. The Third Amended Complaint supplied the additional factual material the March order said was missing. .......... 8

K. The reconsideration order left the original framework intact. .......... 8

**IV. STANDARD OF REVIEW** .......... 9

**V. SUMMARY OF ARGUMENT** .......... 9

**VI. ARGUMENT** .......... 11

**I. THE DISTRICT COURT MISAPPLIED CHULA VISTA AND FAILED TO APPLY PIERCE TO THE DIFFERENT BURDEN PRESENTED HERE.** .......... 11

# TABLE OF CONTENTS (continued)

*Page*

A. Chula Vista addressed whether corporations and associations could themselves serve as official proponents. .......... 11

B. Appellant is a registered Nevada human voter, not a corporation seeking elector status. .......... 12

C. Chula Vista did not decide whether five local public proponents may be required before circulation. .......... 12

D. This appears to present an unresolved Ninth Circuit question rather than a holding already controlled by Chula Vista. .......... 13

E. Pierce expressly holds that residency restrictions can severely burden initiative proponents themselves. .......... 14

F. The reconsideration order turned a less-restrictive alternative into a threshold rule against strict scrutiny. .......... 14

G. It was unfair to dismiss the Chula Vista distinction as mere relitigation without addressing it. .......... 15

**II. THE DISTRICT COURT ERRED BY TREATING NEVADA'S FIVE-PERSON PETITIONERS' COMMITTEE AS A SUBSTANTIVE TEST OF GRASSROOTS SUPPORT AND BY MISAPPLYING ANGLE v. MILLER.** .......... 16

A. Nevada's Five-Person Requirement Is Unusual as a Statewide Mandate. .......... 16

B. Nevada's 1967 Enactment Closely Tracks the Model City Charter's Five-Person Committee and Fifteen-Percent Signature Structure. .......... 17

C. The Model City Charter Describes the Five-Person Committee as an Administrative Device, Not as a Political Gatekeeping Test. .......... 18

D. The District Court Never Examined the Legislative Origin or Historical Function of the Five-Person Requirement Before Calling It a Grassroots-Support "Gatekeeping" Device. .......... 19

E. The State Never Appeared to Supply a Contrary Legislative Purpose, and Appellant Had No Responsive Brief in Which to Address One. .......... 19

## TABLE OF CONTENTS (continued)

*Page*

F. Angle Concerned a Post-Circulation Rule Measuring Actual Voter Support, Not a Pre-Circulation Barrier to Beginning Political Participation. .......... 20

G. Angle's Reliance on Widespread Geographic-Distribution Rules Cuts in the Opposite Direction Here. .......... 21

H. Nevada Already Measures Grassroots Support Through the Fifteen-Percent Signature Requirement. .......... 22

I. The District Court Erred by Comparing the Raw Number Five to the Much Larger Signature Requirement in Angle. .......... 22

J. The Court's Grassroots-Support Rationale Therefore Ignores the Apparent Historic Division of Functions. .......... 23

**III. THE DISTRICT COURT ERRED BY TREATING FIVE SPONSORS AS A "LOW BURDEN" AND APPELLANT'S EXPERIENCE AS "ISOLATED INCIDENTS."** .......... 24

A. The relevant burden cannot be measured by numbers alone. .......... 24

B. Pierce expressly rejects treating the challengers' own diligence as dispositive. .......... 24

C. Even under the district court's own evidentiary approach, the Third Amended Complaint supplied the proof it said was lacking. .......... 25

D. The UNR call logs independently corroborate the burden. .......... 25

E. The district court's own description of the proposal as "taboo" reinforces rather than minimizes the burden. .......... 26

F. Existing organizations illustrate why the same numerical rule can burden speakers differently. .......... 26

G. Willing Nevada residents outside the locality are excluded even when local residents are reluctant to become public sponsors. .......... 27

**IV. THE DISTRICT COURT ERRED BY TREATING PUBLIC SPONSORSHIP AS ELECTORAL SUPPORT.** .......... 28

A. The record contains actual examples of support without sponsorship. .......... 28

## TABLE OF CONTENTS (continued)

*Page*

B. The concern about harassment was not merely speculative. ..................... 28

C. The Five-Sponsor Requirement Frustrates Appellant's Deliberate Strategy of Building Support Through Smaller Nevada Jurisdictions. .......... 29

D. A loud public meeting does not establish the electorate's view. .............. 29

E. The Court cannot treat the absence of five public local sponsors as proof of insufficient support, when the law itself excludes willing Nevada proponents. .......... 30

F. The statutes threatens controversial reform precisely where direct democracy may be most important. .......... 30

**V. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR RELIEF.** .......... 30

A. Appellant Is Likely to Succeed on the Merits Because the District Court Applied the Wrong Legal Framework. .......... 30

B. Appellant Has Already Lost Three Election Cycles, and Without Injunctive Relief the Same Barrier Threatens the 2028 Cycle. ...................... 32

C. The balance of equities favors a narrow injunction. ................................. 33

D. The Public Interest Favors Protecting the Ability of Individuals to Pursue Political Reform Born From Their Own Lives and Experiences. ...... 34

**VI. THE EQUAL-PROTECTION AND NEVADA-CONSTITUTION CLAIMS SHOULD BE RECONSIDERED UNDER THE CORRECT FIRST AMENDMENT FRAMEWORK.** .......... 35

A. Even Under Rational-Basis Review, Nevada's One-Proponent Statewide Rule and Five-Proponent Local Rule Lack a Rational Relationship to the Interests Identified Below. .......... 35

B. Article 19 independently reinforces the importance of access to Nevada's initiative process. .......... 38

**VII. CONCLUSION** .......... 38

**VIII. STATEMENT OF RELATED CASES** .......... 40

**IX. CERTIFICATE OF COMPLIANCE** .......... 41

## TABLE OF CONTENTS (continued)

*Page*

**STATEMENT REGARDING SERVICE AND THE STATE'S NONAPPEARANCE** .......... 42

**CERTIFICATE OF SERVICE** .......... 43

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

Adidas Am., Inc. v. Skechers USA, Inc., 890 F.3d 747 (9th Cir. 2018) ................ 9

Angle v. Miller, 673 F.3d 1122 (9th Cir. 2012) ..... 7–10, 14, 16–17, 19–23, 31, 38

Baird v. Bonta, 81 F.4th 1036 (9th Cir. 2023) ........................................................ 31

Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999) ................................................................................................................ 14

Chula Vista Citizens for Jobs & Fair Competition v. Norris, 782 F.3d 520 (9th Cir. 2015) (en banc) ............................................................ 2, 7, 9–13, 15, 28, 30, 38

Elrod v. Burns, 427 U.S. 347 (1976) (plurality opinion) ...................................... 33

FCC v. Beach Communications, Inc., 508 U.S. 307 (1993) ................................ 36

Hecox v. Little, 104 F.4th 1061 (9th Cir. 2024) .............................................. 9, 31

Lawrence v. Texas, 539 U.S. 558 (2003) ............................................................ 34

Meyer v. Grant, 486 U.S. 414 (1988) ..................................................... 10, 14, 24

Nader v. Brewer, 531 F.3d 1028 (9th Cir. 2008) ................................................. 14

People ex rel. Angle v. Miller, 192 P.3d 1166 (Nev. 2008) ................................ 38

Pierce v. Jacobsen, 44 F.4th 853 (9th Cir. 2022) ............ 2, 7–11, 14–15, 24, 31, 38

Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992) ................................................................................................................ 34

Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008) ............. 30

# TABLE OF AUTHORITIES (continued)

*Page(s)*

**Constitutional Provisions**

U.S. Const. amend. I ........................................ 2, 9, 11–12, 14, 32–35, 38

U.S. Const. amend. XIV ........................................ 2, 35–38

Nev. Const. art. 19 ........................................ 2, 22, 38

Nev. Const. art. 19, § 4 ........................................ 22

**Federal Statutes**

28 U.S.C. § 1292(a)(1) ........................................ 2

28 U.S.C. § 1331 ........................................ 2

28 U.S.C. § 1343 ........................................ 2

42 U.S.C. § 1983 ........................................ 2

**Nevada Statutes and Session Laws**

Nev. Rev. Stat. § 244.345(8) ........................................ 29

Nev. Rev. Stat. § 295.015(1) ........................................ 3, 36

Nev. Rev. Stat. § 295.095(1) ........................................ 2–4, 16, 18, 36, 38

Nev. Rev. Stat. § 295.095(2) ........................................ 16, 18, 22, 36

Nev. Rev. Stat. § 295.205(1) ........................................ 2–4, 16, 18, 36, 38

Nev. Rev. Stat. § 295.205(2) ........................................ 16, 18, 22, 36

Act of Mar. 24, 1967, ch. 186, §§ 4, 11, 1967 Nev. Stat. 378 (Assembly Bill 37) ........................................ 17–18, 31, 37

## TABLE OF AUTHORITIES (continued)

*Page(s)*

**Rules**

Fed. R. App. P. 32(a)(5), (6) .......... 41

Fed. R. Civ. P. 60(b) .......... 2, 7

9th Cir. R. 28-2.6 .......... 40

9th Cir. R. 32-1(f) .......... 41

**Other Authority**

National Municipal League, Model City Charter, art. VIII, §§ 8.02–.03 & commentary, at 28 (5th ed. 1941, 7th printing 1957) .......... 17–19, 23, 31, 37

## I. JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Appellant challenges NRS 295.095(1) and NRS 295.205(1) under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Appellant also asserts a related claim under Article 19 of the Nevada Constitution.

On March 3rd, 2026, the district court denied Appellant's emergency motion for a preliminary injunction. ECF No. 23. On September 22nd, 2026, the court denied Appellant's Rule 60(b) motion seeking reconsideration of that decision. ECF No. 31. Appellant timely appealed.

This Court docketed the preliminary-injunction appeal as No. 26-6311 on September 28th, 2026. This Court has interlocutory appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## II. ISSUES PRESENTED

**1.** Whether the district court misapplied *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015) (en banc). *Chula* involved Plaintiffs challenging an elector requirement that forbade corporations and associations from serving as official proponents, while this present case involves a natural person Nevada elector, who is prohibited from initiating a local petition, unless he recruits four additional local electors.

**2.** Whether the district court erred by treating Nevada's five-person petitioners' committee as a substantive measure of grassroots support and local self-government, rather than as an outdated administrative structure.

**3.** Whether the district court erred in overlooking *Pierce v. Jacobsen,* 44 F.4th 853 (9th Cir. 2022) by holding that Appellant was required to produce evidence showing that Nevada's five-resident sponsorship requirement significantly burdened ballot access.

**4.** Whether Nevada's five-local-sponsor prerequisite severely burdens political participation by requiring five identifiable residents to publicly associate themselves with a proposal before circulation may begin, where the

record shows that residents may support a reform, while refusing public sponsorship because of employment, reputational, social, and personal consequences, and willing Nevada electors residing outside the particular locality are categorically barred from filling the gap.

## III. STATEMENT OF THE CASE

### A. Nevada requires five local public sponsors before a local initiative may circulate.

Nevada permits one sponsor to initiate a statewide petition. NRS 295.015(1). Local initiatives are different. NRS 295.095(1) and NRS 295.205(1) require five registered voters from the particular county or city to form a petitioners' committee before circulation begins.

The difference is structural, not merely numerical, yet it is nevertheless an absurd contradiction.

A statewide proponent may begin with one qualified sponsor. A local proponent must first locate five qualifying voters inside the particular jurisdiction, persuade all five to identify themselves publicly with the proposal, and file their names and addresses before the public may be approached for petition signatures. The local process operates as follows:

**Political proposal**

↓

**Locate five qualifying local electors**

↓

**All five publicly associate themselves with the proposal**

↓

**Circulation may begin**

↓

**Collect the statutory signature threshold**

↓

**Possible ballot placement**

Appellant challenges the second and third thresholds: locate five qualifying local electors, as required under NRS 295.095(1) and NRS 295.205(1), and have them publicly identify themselves. Appellant does not challenge Nevada's other petition-signature requirements, signature verification, circulator requirements, filing deadlines, or other election-integrity provisions.

**B. Appellant spent years attempting to satisfy the five-person requirement.**

Appellant is a Nevada resident and a registered Nevada voter, who seeks to use the initiative process to propose local reforms concerning Nevada's legal-prostitution system. His Third Amended Complaint documents repeated attempts beginning in 2021 to initiate measures in different jurisdictions, including West Wendover, Winnemucca, Eureka County, and Clark County. Third Am. Compl. ¶¶ 3-5, ECF No. 28. The efforts were varied.

Appellant contacted residents through social media. He sent emails. He contacted former candidates, people appearing in Secretary of State records, civic organizations, and political organizations. He sought assistance from individuals who represented that they had contacts in targeted communities. He contacted persons who privately supported the policy. He also sought third-party assistance precisely because cold outreach by one person was proving ineffective.

The effort did not fail merely because Appellant made a few calls and stopped. It persisted across years, jurisdictions, methods, and third parties.

**C. Independent UNR volunteers encountered the same practical barrier.**

In 2022, Appellant obtained volunteer assistance through the University of Nevada, Reno's internship program. Third Am. Compl. ¶¶ 3-4, Exs. A–B.

The significance of those volunteers is important. They supplied an independent test of whether Appellant's inability to locate five public sponsors was simply personal to him. It was not.

One volunteer call log documented calls to 33 West Wendover residents. The notes reflected unanswered calls, voicemail boxes not established, numbers no longer in service, language barriers, immediate hangups, and

express refusals. One person expressed interest, but later moved from West Wendover after her husband obtained work in Utah. Another log documented approximately 70 calls with little success. Id.

Appellant also sent approximately 18 emails to Winnemucca residents on December 12th, 2023, seeking sponsorship assistance and received no response. Third Am. Compl. ¶¶ 19, Ex.. C. Additional outreach to former candidates, civic contacts, political participants, and social-media users similarly failed to produce five public sponsors. Id. ¶¶ 20–24. The Third Amended Complaint later summarized hundreds of attempts by Appellant and his volunteers. Id. ¶¶ 105–108.

**D. The record distinguishes support for reform from willingness to become a public sponsor.**

Appellant's main argument is not that nobody supports his proposals. It is that public sponsorship asks something materially different from signing a petition or casting a secret ballot. One West Wendover resident, identified as "A.," initially agreed to serve as a sponsor and to locate four additional local electors. After community pressure and fear of gossip, she withdrew. Because Nevada requires five sponsors, her withdrawal collapsed that initiative attempt. Id. ¶ 25. Another individual, a school administrator, told Appellant that he agreed with the proposed legalization effort, but could not allow his name to be publicly listed as a sponsor because of possible employment consequences. Id. ¶ 27.

The Third Amended Complaint expressly states that the inability to assemble five sponsors "should not be confused with lack of local or grassroots support." Id. ¶ 26.

That distinction is the heart of this appeal. A voter may be willing to sign, willing to vote yes, and may privately support discussion of the proposal, but that same voter may be unwilling to become one of five publicly identified people responsible for launching a controversial initiative in his or her own small community.

That distinction seems to be misunderstood with the district court.

**E. Appellant alleged concrete evidence explaining the reluctance of many to become public sponsors.**

The chilling effect alleged here is not purely hypothetical. The Third Amended Complaint alleges that an individual using the name Elijah Edwards sent Appellant and an acquaintance a message stating that their

families, friends, coworkers, and neighbors were being contacted concerning their prostitution-related activities. Third Am. Compl. ¶¶ 88–92 & Ex. M.

Appellant also recounted an in-person experience in Esmeralda County that happened in 2024. When he requested that a prostitution ordinance be placed on a public agenda, word spread through the community without Appellant advertising the meeting or contacting residents. Nonetheless, opponents appeared at the meeting in strong opposition. Id. ¶¶ 93–96 & Ex. M. Had any supporters from Goldfield been at that hearing, they more than likely would have been targeted by the opponents.

Those incidents demonstrate why the willingness to become a named public sponsor cannot simply be equated with support for or opposition to the underlying proposal.

**F. Existing organized networks can satisfy the requirement in a way lack of existing networks cannot.**

The Third Amended Complaint also contrasted Appellant's experiences with anti-brothel initiative campaigns in Lyon (2018), Nye (2018), Lincoln (1978), and Churchill (2004) Counties. Id. ¶¶ 75–83.

Appellant argued that those campaigns benefited from church and religious networks, in which participants already knew one another, regularly associated, shared ideological commitments, and could identify like-minded public sponsors within an existing community.

Appellant lacked any comparable network in the jurisdictions where he sought reform. The targeted jurisdictions did not have existing brothels, had non-responsive or unidentifiable political party leaders and had no adult entertainment presence that was willing to back his proposal.

That distinction is particularly important in jurisdictions without an existing brothel or adult entertainment industry. A proponent seeking to introduce legalization cannot draw upon existing local brothel owners, workers, vendors, or industry organizations. In several jurisdictions, the very constituency that might eventually form around a proposal does not yet exist.

The challenged statutes therefore require a proponent to possess an organized five-person local political network before the law permits him to begin the public process through which such a network might otherwise develop. In other words, the law's burden is essentially a needle in a haystack.

**G. The March 3rd order characterized the burden as minimal.**

The district court denied the preliminary injunction on March 3rd, 2026. ECF No. 23 at 4. Relying mainly on *Chula Vista* and *Angle*, the court concluded that strict scrutiny did not apply. The court characterized *Chula Vista* as establishing that residency and disclosure restrictions on official proponents do not warrant strict scrutiny because the role of official proponent is a unique legislative position and because the restriction does not prevent others from speaking about the initiative.

The court then relied on *Angle* for the proposition that strict scrutiny applies when ballot-access restrictions significantly inhibit a reasonably diligent initiative proponent. The court concluded: "finding five voters is a low burden for a petitioner." ECF No. 23 at 6. The court further concluded that Appellant had not shown that his difficulties were more than "isolated incidents." Id. The court therefore applied less-exacting review.

**H. The court treated the additional four sponsors as a "gatekeeping" mechanism for grassroots support.**

After declining strict scrutiny, the district court concluded that Nevada had important interests in local self-government and ensuring grassroots support. It relied on *Chula Vista*'s discussion of the government's interest in reserving official legislative roles to members of the local political community and on *Angle*'s discussion of Nevada's interest in requiring sufficient grassroots support for ballot qualification. The court acknowledged that Nevada requires five local proponents rather than the one-proponent arrangement principally discussed in *Chula Vista*, but described the difference as only a "slight additional gatekeeping burden." ECF No. 23 at 9. The court also reasoned that Nevada's local restrictions were "identical or less burdensome" than restrictions sustained in *Chula Vista* and *Angle*. Id.

**I. Appellant sought reconsideration and identified controlling factual differences.**

Appellant moved for reconsideration under Rule 60(b), arguing that the March order misapplied *Pierce*, *Chula Vista*, and *Angle*. ECF No. 25. The reconsideration motion specifically argued that *Chula Vista* concerned corporations and associations seeking official-proponent status, while Appellant is a human Nevada voter/elector. The motion argued that *Chula Vista* did not decide whether a human voter could

be excluded from initiating local legislation, solely because he resides elsewhere in Nevada or whether five public sponsors should be required before petition circulation. ECF No. 25 at 6–7.

The motion also argued that *Pierce* expressly recognized burdens on "in-state proponents," that absence of direct proof of failed ballot access was not dispositive, and that residency restrictions must be evaluated according to their practical effect on the pool of political participants.

Finally, Appellant explained that the Ninth Circuit's *Angle* decision involved a geographic distribution requirement governing signatures after a petition was circulating, while Nevada's five-sponsor requirement determines whether circulation may begin at all. ECF No. 25 at 7–9.

**J. The Third Amended Complaint supplied the additional factual material the March order said was missing.**

In his motion for reconsideration, Appellant said that he had additional information documenting his recruitment attempts and asked for permission to amend his complaint for a third time. The court allowed the Third Amended Complaint (TAC). The TAC added the extensive outreach history described above, including UNR call logs, years of electronic outreach, residents who privately supported reform, but would not sponsor publicly, community-pressure evidence, employment concerns, and evidence of targeting associated with Appellant's advocacy.

Thus, even if the March order's demand for additional individualized evidence were correct, the operative pleading later supplied it.

**K. The reconsideration order left the original framework intact.**

On September 22nd, 2026, the district court denied reconsideration. Regarding *Pierce*, the court relied on a passage from the narrow-tailoring portion of that opinion, in which the Ninth Circuit observed that Montana's self-government interest could be protected through a system requiring official proponents, petition signers, and voters to be residents. The district court treated this statement as showing that *Pierce* had "identified exactly what Greer is challenging here—a residency requirement for official proponents of an initiative—as a

permissible restriction on elections." ECF No. 31 at 2. The court did not separately analyze the additional numerical requirement of five public local sponsors.

Regarding *Chula Vista*, the court stated that Appellant's argument was an attempt to relitigate an issue already decided. Id. Regarding *Angle*, the court acknowledged that *Angle* concerned signature collection and not "finding initial proponents to kickstart the signature process," but concluded that this distinction did not undermine Nevada's asserted interest in grassroots support. ECF No. 31 at 3. This appeal followed.

**IV. STANDARD OF REVIEW**

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). But the legal issues underlying preliminary injunctive relief are reviewed **de novo**, because a district court abuses its discretion when its ruling rests on an erroneous view of law. *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018). Factual findings are reviewed for clear error. A finding is clearly erroneous where it is illogical, implausible, or unsupported by permissible inferences from the record. The main disputes here are legal:

1. what *Chula Vista* actually decided;
2. how *Pierce* applies to a residency restriction that diminishes the available pool of initiative participants;
3. whether *Angle*'s treatment of a post-circulation geographic-signature rule controls a pre-circulation five-sponsor gate; and
4. what level of First Amendment scrutiny applies.

Those questions should be reviewed de novo.

**V. SUMMARY OF ARGUMENT**

The district court treated the preliminary injunction as though Ninth Circuit precedent had already resolved this case. It has not.

First, *Chula Vista* concerned whether corporations and associations could themselves occupy the formal position of official proponent, when California law reserved that role to electors. Two natural-person city residents were available, agreed to serve as proponents, and the initiative ultimately proceeded. This present

case is materially different. Appellant is himself a human Nevada voter, not a corporation. He is barred because he resides outside the targeted locality, and Nevada additionally requires five local public sponsors before circulation may begin. Appellant has found no published Ninth Circuit decision that has similar facts and that includes the combination of residency, public identification, numerical sponsorship, and pre-circulation exclusion.

Second, the district court applied *Angle*'s grassroots-support rationale into the wrong stage of the initiative process. *Angle* involved a geographic distribution rule, requiring proponents who were already circulating a statewide petition to obtain signatures in each congressional district. The Ninth Circuit emphasized that geographic distribution requirements were common, appearing in half the states with initiative systems, and that such rules measure whether an initiative has statewide rather than merely localized support. Nevada's five-sponsor rule does not measure actual voter support at all. It determines whether voters may be asked for support in the first place.

Third, *Pierce* undermines the district court's "low burden" and "isolated incidents" reasoning. *Pierce* considered a case in which plaintiffs offered little more than speculation about eventual ballot-access failure and in which fourteen initiatives had successfully qualified. The Ninth Circuit nonetheless held that lack of evidence under one *Meyer consideration* was not dispositive and that courts must weigh the regulation as a whole. It further held that the residency rule severely burdened the rights of both nonresident participants and in-state initiative proponents. And footnote 3 expressly explains that the question is not whether the challengers themselves were diligent, but the burden imposed upon a hypothetical reasonably diligent initiative proponent.

Even if additional evidence were required for reconsideration, Appellant later added it. His Third Amended Complaint documented years of outreach, hundreds of contacts, independent UNR volunteers, residents who supported reform but would not publicly sponsor, one resident who withdrew after community pressure, an administrator concerned about employment, and concrete evidence explaining fears of public association.

Fourth, Nevada's rule confuses willingness to become a named sponsor with grassroots political support. The two are not the same. The State already measures grassroots support through petition signatures. The five-person requirement instead measures whether five identifiable local residents are willing to accept public association with a proposal before circulation begins. When local supporters are unwilling to assume that public role and willing Nevada residents outside the locality are categorically excluded, the initiative process reaches a dead end before the public can express any view.

The March 3rd & September 22nd orders should be vacated and the preliminary injunction be remanded for reconsideration under the correct First Amendment framework.

## VI. ARGUMENT

## I. THE DISTRICT COURT MISAPPLIED *CHULA VISTA* AND FAILED TO APPLY *PIERCE* TO THE DIFFERENT BURDEN PRESENTED HERE.

### A. *Chula Vista* addressed whether corporations and associations could themselves serve as official proponents.

The March order treated *Chula Vista* as though it largely resolved this case. The facts show otherwise. *Chula Vista* identified two challenged requirements: an elector requirement that disqualified corporations and associations from being official proponents and a disclosure requirement requiring the official proponent's name to appear on circulated petitions. 782 F.3d at 524–25. The organization plaintiffs wanted to serve as official proponents. Because corporations and associations could not be electors, they asked two actual Chula Vista residents, Lori Kneebone and Larry Breitfelder, to serve as the proponents instead. They agreed. Id. at 525. California required the signature of at least one, but not more than three, official proponents. Id.

The residents successfully initiated the process. On their first effort, they gathered 23,285 signatures but printed the organizations' names rather than their own names on the circulated petitions. After the clerk rejected those petition papers, they restarted the process in compliance with the disclosure rule. Their second effort succeeded, and Proposition G appeared on the ballot and was approved by Chula Vista voters. Id. at 525–26.

Those facts matter.

The constitutional issue before the en banc court in *Chula Vista* was whether corporations and associations had a First Amendment right to be listed as the official circulators and whether disclosure of the human proponents' identities was constitutional.

This present appeal presents a different problem and a different set of facts. As *Chula Vista* stated: whether corporations can be electors is "not what is at issue in this case." 782 F.3d at 531.

**B. Appellant is a registered Nevada human voter, not a corporation seeking elector status.**

Appellant is already a natural person, Nevada resident, registered voter[1] and therefore, a qualified Nevada elector. He is eligible to initiate a statewide petition under Nevada law. In fact, he did in fact file a statewide petition in 2022 but withdrew it after his efforts had been sabotaged by internet trolls.[2]

If Greer, however, seeks to initiate a local initiative in another Nevada city or county that he isn't a resident of, Nevada categorically excludes him from serving as the listed committee proponent because of his intrastate residence. He must then locate five qualifying residents of that locality before circulation may begin.

It is simply and respectfully illogical to equate a corporation or association that cannot vote anywhere with a natural Nevada elector, who is fully qualified to vote, but resides in another Nevada locality.

*Chula Vista* did not decide that question. Indeed, the en banc opinion expressly framed the challenged elector rule as one "disqualifying corporations and associations from holding" the official-proponent position. 782 F.3d at 524. The distinction is not semantic.

The constitutional justification for refusing to turn a corporation into an "elector" does not automatically answer whether a State may exclude an actual human elector from initiative initiation because he lives one county or city away.

**C. *Chula Vista* did not decide whether five local public proponents may be required before circulation.**

There is another critical distinction: *Chula Vista* did not involve a five-person requirement. California permitted between one and three proponents. Two willing local residents were readily available and served.

[1] Greer's voter registration: https://voterrecords.com/voter/118013001/russell-greer

[2] https://www.nvsos.gov/home/showpublisheddocument/10680/637915995664830000

Nevada requires five. The March order acknowledged this difference but called it merely a "slight additional gatekeeping burden." That conclusion assumes the very point Appellant disputes.

The difference between one willing resident and five willing residents may be trivial for an established organization that already has a cohesive local membership. It can be movement-ending for a lone proponent entering a locality where he has no preexisting organizational network. The Third Amended Complaint demonstrates that fact. Appellant repeatedly located individuals who expressed interest or support but could not assemble five public sponsors simultaneously.

As the facts previously stated:

- One potential sponsor withdrew.
- One supporter would not risk his employment.
- Others wanted to remain private.
- Even when Appellant located "A.," she still needed four additional registered local electors before the initiative could begin.

The numerical requirement therefore cannot simply be treated as constitutionally permissible simply because the number five appears small on paper.

**D. This appears to present an unresolved Ninth Circuit question rather than a holding already controlled by *Chula Vista*.**

Appellant has found no published Ninth Circuit opinion addressing a statewide statute that combines all four of the features challenged here:

1. exclusion of human electors who live outside the particular locality;
2. a requirement of five rather than one qualifying local proponents;
3. public identification of those proponents; and
4. a complete prohibition on circulation until all five are obtained.

*Chula Vista* supplies relevant principles. It does not resolve all of the questions and facts of the case. This case therefore presents, at minimum, a materially different question that should be analyzed under the practical-

burden framework developed in *Meyer*, *Buckley*, *Nader*, *Angle*, and *Pierce*, rather than resolved simply by attaching the label "official proponent."

**E. *Pierce* expressly holds that residency restrictions can severely burden initiative proponents themselves.**

The district court's treatment of *Pierce* is particularly important. *Pierce* involved Montana's requirement that initiative petition circulators be Montana residents. The district court there had declined strict scrutiny because the challengers supplied little evidence that the restriction would actually prevent ballot qualification. The Ninth Circuit acknowledged that Plaintiffs provided "little beyond their own bare speculation," and fourteen initiatives had qualified despite the restriction. 44 F.4th at 861.

But *Pierce* did not stop there. It held that *Meyer* did not establish a rigid two-part test and that the challengers' lack of evidence on the second consideration was "not dispositive." Id. The court instead required consideration of all effects of the regulation. It concluded that residency diminished the available pool and held that the restriction imposed a severe burden on the First Amendment rights of both "out-of-state residents and **in-state proponents**." Id. at 861–62. That language is fatal to any categorical assumption that residency restrictions matter only to the person directly excluded from a formal role.

Per *Pierce,* a proponent's First Amendment interests matter too.

**F. The reconsideration order turned a less-restrictive alternative into a threshold rule against strict scrutiny.**

The reconsideration order relied on a later passage in *Pierce*. After *Pierce* had already held that Montana's residency rule imposed a severe burden and that strict scrutiny applied, Montana argued that the restriction was narrowly tailored to protect self-government. The Ninth Circuit rejected that argument. It stated that Montana had not "met its burden" of showing why its restrictions were narrowly tailored. 44 F.4th at 863.

The district court in this case interpreted that passage as meaning that *Pierce* had identified residency requirements for official proponents as categorically "permissible." That reading skips the procedural posture of the passage. The Ninth Circuit was already applying strict scrutiny. It was identifying a **less restrictive**

**alternative** to Montana's restriction on petition circulators. A less-restrictive alternative identified during strict-scrutiny analysis is not a holding that every rule using that alternative automatically receives minimal scrutiny.

And *Pierce* certainly did not decide Nevada's separate requirement that **five** publicly identified local residents must exist before circulation begins. The reconsideration order therefore converted a narrow-tailoring observation into a threshold immunity from strict scrutiny that *Pierce* does not provide.

Even after misreading *Pierce*'s discussion of Montana, the district court never conducted the narrow-tailoring inquiry that *Pierce* itself required once a severe burden was found. The court never explained why Nevada needs five local official proponents rather than one, why those proponents must be secured before circulation begins, or why Nevada's existing local-signature requirement would not adequately protect the asserted interests in local self-government and grassroots support. The March order's statement that the statutes were "sufficiently tailored" was made under less-exacting review, not strict scrutiny, and therefore cannot substitute for the narrow-tailoring analysis required if *Pierce* governs.

**G. It was unfair to dismiss the *Chula Vista* distinction as mere relitigation without addressing it.**

Appellant's reconsideration motion expressly argued that *Chula Vista* involved corporations and associations, while this case involved a natural Nevada elector. The district court did not explain why that distinction was legally irrelevant. Instead, it characterized the argument as an attempt to relitigate a previously decided issue. But reconsideration was sought **<u>precisely</u> <u>because</u>** Appellant contended that the original order had overlooked an important legal distinction in the authority on which it relied. Appellant was not merely asking the court to repeat itself.

Appellant was asking why a case about corporations seeking elector status should control a natural Nevada voter, who is excluded solely because of his intrastate location and because he cannot assemble four additional local residents. The September or March orders never answered that question, instead saying that local communities should decide local concerns.

This Court should answer that question de novo.

## II. THE DISTRICT COURT ERRED BY TREATING NEVADA'S FIVE-PERSON PETITIONERS' COMMITTEE AS A SUBSTANTIVE TEST OF GRASSROOTS SUPPORT AND BY MISAPPLYING *ANGLE v. MILLER*.

### A. Nevada's Five-Person Requirement Is Unusual as a Statewide Mandate.

Nevada requires five registered voters of a county or city to form a petitioners' committee before a local initiative may begin circulation. Nev. Rev. Stat. §§ 295.095(1), 295.205(1). Only after that committee is formed may the petition proceed to circulation and attempt to obtain signatures equal to at least fifteen percent of the local electorate. Id. §§ 295.095(2), 295.205(2).

Appellant's research identified no other state that imposes this same five-local-sponsor requirement statewide as a prerequisite to local initiative circulation. Third Am. Compl. ¶¶ 123–27, ECF No. 28.

The closest analogues Appellant identified are scattered municipal or home-rule provisions, including Los Angeles, California; St. Marys, Pennsylvania; and the Minnesota charter cities of Hutchinson and Ramsey. Id. ¶ 125 & nn.1–3. These municipal provisions matter because they reveal where the five-person committee structure historically appears: in local charter systems governing the administration and commencement of municipal initiative proceedings.

Nevada is different. It took that local committee structure and imposed it by state statute across local initiative proceedings throughout Nevada. That distinction matters under the district court's own reliance on *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012). *Angle* did not treat every election regulation as presumptively legitimate merely because a state enacted it. In evaluating Nevada's geographic-distribution rule, this Court expressly noted that "[h]alf of the states with initiatives" imposed geographic distribution requirements on petition signatures. Id. at 1135. That widespread practice supported the conclusion that geographic distribution was a recognized method of requiring statewide, rather than geographically concentrated, support. Id.

The inverse consideration is relevant here. If the existence of similar requirements in approximately half the initiative states supported Nevada's regulation in *Angle*, the absence of any comparable statewide five-local-

sponsor requirement elsewhere weakens the claim that Nevada's rule is a conventional or necessary mechanism for measuring grassroots support.

**B. Nevada's 1967 Enactment Closely Tracks the Model City Charter's Five-Person Committee and Fifteen-Percent Signature Structure.**

The historical enactment of Nevada's statutes further undermines the district court's characterization of the five-person requirement as a merely grassroots-support threshold.

Nevada adopted its present local initiative framework in 1967 through Assembly Bill 37. See Act of Mar. 24, 1967, ch. 186, §§ 4, 11, 1967 Nev. Stat. 378, 378–82. The original enactment provided that: "Any five registered voters" could commence local initiative proceedings by filing an affidavit stating that they would "constitute the petitioners' committee" and be responsible for circulating and properly filing the petition. Id. §§ 4(1), 11(1). In the immediately following subsection, the same enactment separately required initiative petitions to obtain signatures from at least **fifteen percent** of the relevant electorate. Id. §§ 4(2), 11(2).

That combination is strikingly similar to the Model City Charter structure that predates Nevada's 1967 enactment. The Model City Charter likewise separated:

1. **Commencement of Proceedings; Petitioners' Committee; Affidavit**, and
2. **Petitions**, including the numerical signature requirement.

See Nat'l Mun. League, *Model City Charter* art. VIII, §§ 8.02–.03 & commentary, at 28 (5th ed. 1941, 7th printing 1957).

The Charter commentary expressly explained the function of the committee: "Requiring a petitioners' committee places clear responsibility for the undertaking of initiative, referendum or recall proceedings." Id. § 8.02 commentary.

The next section separately discussed the number of voter signatures required and explained the adoption of a **fifteen-percent** threshold. Id. § 8.03 commentary.

The 1967 Nevada statutes and the 1957 Model City Charter similar texts are difficult to dismiss as coincidence. Nevada's 1967 enactment adopted the same basic structure: a five-person petitioners' committee

responsible for undertaking and administering the petition, followed by a separate fifteen-percent signature requirement.

The textual and structural similarity strongly supports the inference that Nevada adopted an existing municipal initiative model in which the five-person committee assigned administrative responsibility and the signature requirement supplied the actual measure of popular support.

This Court must keep in mind that 1967 was before modern technology. It would make sense back then to have multiple members to act as back ups in case something happened to the main proponent. Now in 2026, we have Google Drive and iCloud to share and preserve important files.

**C. The Model City Charter Describes the Five-Person Committee as an Administrative Device, Not as a Political Gatekeeping Test.**

The distinction between the two provisions is critical. The Model City Charter commentary does not say that five committee members are required to demonstrate grassroots support. Instead, it says that requiring a petitioners' committee places **"clear responsibility"** for undertaking the proceeding. The signature provision is where the Charter addresses the number of voters required to support the initiative.

Nevada follows the same division. Under NRS 295.095(1) and 295.205(1), the five individuals:

- constitute the petitioners' committee;
- take responsibility for circulating the petition;
- take responsibility for filing it in proper form;
- provide their names and addresses; and
- designate where official notices will be sent.

Those are administrative and accountability functions. Then, in subsection two, Nevada separately requires fifteen-percent voter support. Nev. Rev. Stat. §§ 295.095(2), 295.205(2). Thus, the statutory structure itself points toward two distinct functions:

**Five-person committee:** responsibility for administering the initiative.

**Fifteen-percent signatures:** demonstration of electoral support.

The district court collapsed those two functions into one.

**D. The District Court Never Examined the Legislative Origin or Historical Function of the Five-Person Requirement Before Calling It a Grassroots-Support "Gatekeeping" Device.**

The March 3rd order concluded that requiring five local proponents imposed only a "slight additional gatekeeping burden" and served Nevada's interest in ensuring grassroots support. ECF No. 23 at 9. But the court identified no Nevada legislative history demonstrating that the Legislature selected the number five because five public sponsors were believed to measure grassroots political support. The court cited no committee testimony. It cited no legislative findings. It cited no bill-drafting history. It cited no historical source explaining that five public proponents were intended to screen initiatives for popularity. And it did not examine the Model City Charter from which Nevada's statutory structure appears to copy.

That omission matters because the aforementioned source points towards an entirely different explanation: the committee exists to assign responsibility for managing the initiative process, while voter signatures separately determine whether sufficient popular support exists.

The district court therefore transformed an apparently administrative commencement provision into a substantive political threshold without identifying evidence that the Nevada Legislature intended it to serve that function.

**E. The State Never Appeared to Supply a Contrary Legislative Purpose, and Appellant Had No Responsive Brief in Which to Address One.**

The procedural posture makes the problem sharper. The State did not appear during the preliminary-injunction proceedings and filed no opposition defending the statutes. It therefore supplied no legislative history, testimony, policy evidence, or explanation tying the number five to grassroots support. Appellant anticipated addressing the State's justification for the statute in a responsive filing. But because the State never appeared, no such response occurred. Instead, the district court came up with the grassroots-support rationale itself. It relied on *Angle*, a case Appellant had not invoked for this case, and which concerned a materially different regulation at a materially different stage of the initiative process.

Thus, Appellant was not confronting a State argument that the five-person committee represented grassroots support. That theory first emerged from the court's own analysis. When Appellant later challenged the analysis on reconsideration, the district court rejected the distinction and stated that the fact that *Angle* involved signature collection rather than "finding initial proponents to kickstart the signature process" did not undermine its reasoning. ECF No. 31 at 3. But that difference is exactly what makes *Angle* materially different.

**F. *Angle* Concerned a Post-Circulation Rule Measuring Actual Voter Support, Not a Pre-Circulation Barrier to Beginning Political Participation.**

The district court erred by relying on *Angle.* In *Angle,* the initiative process had already begun. Proponents could circulate petitions.Voters could be approached. Signatures could be collected. The challenged rule required those actual voter signatures to be geographically distributed among congressional districts. *Angle*, 673 F.3d at 1126–27. The process therefore looked like this:

**Petition exists**

↓

**Circulation begins**

↓

**Voters sign**

↓

**Actual voter support is geographically measured**

↓

**Ballot qualification**

On the other hand, Nevada's five-person local rule operates before any of that may occur:

**Political proposal**

↓

**Locate five qualifying local electors**

↓

**All five publicly associate themselves with the proposal**

↓

**Only then may circulation begin**

↓

**Only then may voters sign**

↓

**Fifteen-percent support requirement**

↓

**Possible ballot qualification**

That procedural-stage distinction is constitutionally significant. *Angle* concerned how a State measures demonstrated support **after voters are already participating**. Nevada's five-sponsor rule **determines** whether voter participation **may begin at all.**

**G. *Angle*'s Reliance on Widespread Geographic-Distribution Rules Cuts in the Opposite Direction Here.**

This Court's final reasoning in *Angle* is particularly important. The 9th Circuit emphasized that approximately half the states permitting initiatives used geographic-distribution requirements. 673 F.3d at 1135. That widespread practice reinforced the legitimacy of requiring the *Angle* proponents to demonstrate that their proposal had support throughout the State rather than only in the most populous region. Id. No comparable showing exists in this appeal.

Appellant looked and has found no other state imposing a statewide rule requiring five local public sponsors before a local initiative may begin circulation. Instead, the comparable five-person rules appear principally in scattered municipal-charter systems. That distinction cuts directly against treating *Angle* as dispositive.

If widespread adoption of an election regulation supported the governmental interest in *Angle*, the absence of comparable statewide adoption here removes that support.

Nevada's five-person requirement is not shown to be a common method of measuring grassroots support. The cited sources instead indicate that the five-person committee arose as an administrative device for assigning responsibility for the initiative process.

**H. Nevada Already Measures Grassroots Support Through the Fifteen-Percent Signature Requirement.**

Nevada does not need five public sponsors to determine whether a local initiative possesses actual grassroots support. Its statutes already answer that question directly.

Appellant argued this in his Third Amended Complaint, p. 132.

A county initiative must obtain signatures equal to at least fifteen percent of the voters who voted in the preceding general election. Nev. Rev. Stat. § 295.095(2). A city initiative likewise must obtain signatures equal to at least fifteen percent of the voters who voted in the preceding city election. Id. § 295.205(2). Nevada's Constitution likewise reserves local initiative power to county and municipal voters and expressly ties local initiative institution to a fifteen-percent voter threshold. Nev. Const. art. 19, § 4.

Those signatures measure actual political support. They are cast by actual voters. They are collected from the jurisdiction whose law is proposed to be changed. And they directly answer whether enough members of that political community support advancing the measure.

By contrast, the five-person committee measures whether five individuals are willing to assume public responsibility for initiating the proposal before circulation. Those are different things. A person may support an initiative. Yet that same person may be unwilling to become a publicly identified sponsor.

Nevada therefore already possesses the mechanism *Angle* recognized as legitimate for testing grassroots support: actual petition signatures.

**I. The District Court Erred by Comparing the Raw Number Five to the Much Larger Signature Requirement in *Angle*.**

The March order reasoned that five sponsors were "orders of magnitude lower" than the numerical burden sustained in *Angle*. ECF No. 23 at 9. But numerical size is not the relevant distinction. The burden is not the committee of five. The burden is that five qualifying public sponsors must exist **before circulation may begin**. A requirement involving thousands of signatures after circulation has begun permits proponents to:

- speak with voters;
- distribute petitions;
- recruit supporters;
- develop organizations;
- publicize the proposal;
- attract volunteers; and
- build the constituency needed for qualification.

Most of all, signing a petition is usually private and can only be accessed through formal channels. Nevada's five-person rule, on the other hand, requires the five person to be very public, sometimes with media publishing their names.

Thus, five can operate as an absolute barrier even though the number itself is small. The district court therefore compared inapposite facts and regulations.

**J. The Court's Grassroots-Support Rationale Therefore Ignores the Apparent Historic Division of Functions.**

The statutory history, Model City Charter materials, and Nevada's separate fifteen-percent requirement all point toward the same division of functions: **the petitioners' committee administers the process and the petition signatures demonstrate political support.**

The district court ignored that structure by treating the five-person committee itself as a measure of grassroots support. Nothing in *Angle* requires that result. To the contrary, *Angle* concerned a Rule that measured actual voter support and emphasized that similar Rules were widely used throughout initiative states. Nevada's five-person statewide rule has neither characteristic. The district court therefore erred in treating *Angle* as validating

Nevada's five-person pre-circulation barrier and in characterizing the requirement as a substantive grassroots-support test without examining its apparent administrative origin, the State's lack of any contrary historical justification, or Nevada's existing fifteen-percent signature requirement.

## III. THE DISTRICT COURT ERRED BY TREATING FIVE SPONSORS AS A "LOW BURDEN" AND APPELLANT'S EXPERIENCE AS "ISOLATED INCIDENTS."

### A. The relevant burden cannot be measured by numbers alone.

The March order repeatedly treated the number five as inherently small. But the burden challenged here is not the number five. It is: finding five qualifying people, inside a particular locality, willing to identify themselves publicly, with a controversial proposal, before circulation begins.

Five is a small number only if the law assumes that a five-person political network already exists like with the previously cited anti-brothel groups. For a pro brothel measure, finding five public sponsors has been hard for initiatives that the district court acknowledged as "taboo". ECF No. 23 at 3, 6.

### B. *Pierce* expressly rejects treating the challengers' own diligence as dispositive.

This is where *Pierce* most directly contradicts the March order. *Pierce* acknowledged that the plaintiffs offered little evidence that Montana's residency requirement actually prevented initiatives from reaching the ballot. Fourteen initiatives had qualified. Yet the court held that lack of evidence under the second *Meyer* consideration was not dispositive. Footnote three is even more direct. The Ninth Circuit observed that the district court had seemingly required the challengers themselves to act with reasonable diligence and show that their efforts were frustrated. The Ninth Circuit corrected that approach, holding that the question is not whether the challengers themselves, or even other actual proponents, were reasonably diligent. The relevant question is the severity of the burden on a **hypothetical reasonably diligent initiative proponent**. That is materially different from the reasoning used here.

The March order treated Appellant's own recruitment results and efforts as central evidence that the statute imposed only a minimal burden. Under *Pierce*, the structural restriction itself must also be analyzed.

**C. Even under the district court's own evidentiary approach, the Third Amended Complaint supplied the proof it said was lacking.**

There is an additional reason the "isolated incidents" premise cannot carry the P.I. denial order forward. Appellant subsequently provided extensive evidence through amendment. The court permitted the Third Amended Complaint. That pleading documented:

- multi-year attempts beginning in 2021;
- multiple Nevada jurisdictions;
- email outreach;
- social-media outreach;
- outreach to former candidates and civic contacts;
- political organizations;
- third-party assistance;
- UNR volunteers;
- hundreds of attempted contacts;
- persons who privately supported reform;
- persons unwilling to become public sponsors;
- a sponsor who withdrew after pressure;
- an employment-related concern;
- actual targeting associated with Appellant's advocacy.

Those are not a few isolated incidents. They describe a repeated pattern across years, methods, participants, and jurisdictions.

**D. The UNR call logs independently corroborate the burden.**

The UNR evidence is particularly important because it backs up Appellant's arguments. Appellant's volunteers independently contacted West Wendover residents. One call log documented 33 contacts involving unanswered calls, missing voicemail, disconnected numbers, language barriers, immediate hangups, and express

refusals. Another reflected approximately 70 contacts with little success. The volunteers encountered the same obstacle Appellant encountered. That evidence supports the proposition that assembling five strangers through ordinary cold outreach is not automatically a "low burden" simply because five is numerically small.

**E. The district court's own description of the proposal as "taboo" reinforces rather than minimizes the burden.**

The March order repeatedly recognized the controversial and "taboo" nature of Appellant's initiatives. That characterization matters to the burden analysis. If the subject is sufficiently stigmatized that residents may be reluctant to place their names publicly on a sponsorship affidavit, then the character of the proposal affects the available pool of public proponents.

The district court cannot simultaneously recognize the unusual stigma surrounding the subject and assume that locating five publicly identified sponsors is necessarily easy. The two propositions pull in opposite directions.

**F. Existing organizations illustrate why the same numerical rule can burden speakers differently.**

Appellant's Third Amended Complaint alleged that anti-brothel campaigns were able to reach ballots through existing church and religious networks. People inside an established association know one another. They already possess trust. They meet. They share political or moral commitments. They can ask four fellow members to join a committee without cold-calling hundreds of strangers.

A lone proponent without such a network is differently situated.

This disparity is especially jarring when the proposed reform concerns a subject for which no local industry or cohesive advocacy network presently exists. In a jurisdiction without a brothel, Appellant cannot simply ask five existing local brothel owners or employees to serve. There's a strip club in West Wendover and again, Appellant could never reach anybody for an answer. Appellant has also discovered hypocrisy in the adult entertainment business: a person affiliated with some adult entertainment, doesn't necessarily translate support for brothels.

The statute effectively requires the organized constituency to exist before the initiative process can be used to organize the constituency. It's a catch-22.

**G. Willing Nevada residents outside the locality are excluded even when local residents are reluctant to become public sponsors.**

The restriction also creates a structural dead end. Appellant is not a resident of Maine attempting to dictate Nevada law from across the country. He lives in Nevada. He is a Nevada voter. Nevada nevertheless excludes him from initiating local proposals outside his own locality. Even in Clark County, where Greer is a registered voter, he still has to find 4 other supporters to publicly identify themselves. Thus two things can occur simultaneously:

**Willing Nevada proponent outside locality**

↓

**Categorically excluded**

and

**Local residents who privately support proposal**

↓

**Unwilling to become publicly identified sponsors**

The consequence is:

**No five-person committee**

↓

**No circulation**

↓

**No signatures**

↓

**No measurement of actual voter support**

That is a substantial burden on the ability to introduce controversial local reform through the initiative process.

## IV. THE DISTRICT COURT ERRED BY TREATING PUBLIC SPONSORSHIP AS ELECTORAL SUPPORT.

### A. The record contains actual examples of support without sponsorship.

The March order treated the five-person threshold as a modest test of grassroots support. The record demonstrates why that assumption is unreliable. The school administrator supported the policy but would not risk public sponsorship. "A." initially agreed but withdrew after community pressure and fear of gossip. Other individuals supported reform privately but did not want to attach their names. Clark County contacts wanted to remain hidden. These facts show that willingness to become an official sponsor measures more than political opinion. It measures willingness to accept public identification and the personal consequences that may accompany it.

### B. The concern about harassment was not merely speculative.

*Chula Vista* itself distinguished conclusory fears that supporters might experience harassment from circumstances showing a reasonable probability of actual harassment. Appellant's allegations are materially different from bare speculation. Exhibit M documented a communication stating that family, friends, coworkers, and neighbors were being contacted concerning Appellant's prostitution-related activities. The pleading also described the rapid public response to Appellant's Esmeralda County agenda request.

Those experiences provide a concrete basis for Appellant's allegation that a resident may support political discussion and signing a petition, while declining to become one of five publicly named people attached to the proposal.

**C. The Five-Sponsor Requirement Frustrates Appellant's Deliberate Strategy of Building Support Through Smaller Nevada Jurisdictions.**

Appellant's initiatives have focused substantially on Nevada's smaller counties because Nevada law itself makes those jurisdictions the practical arena for legal-brothel reform. NRS 244.345(8) prohibits counties with populations of 700,000 or more from licensing houses of prostitution. Nev. Rev. Stat. § 244.345(8). Thus, meaningful local reform efforts concerning licensed brothels necessarily tend to occur in Nevada's smaller counties and communities.

Appellant's strategy was deliberate: succeed first in smaller jurisdictions, demonstrate that reform could function locally, and use those successes to build political credibility and broader support for larger reforms over time. But the challenged statute prevents even that incremental approach from beginning. Before Appellant can circulate a petition, build a constituency, test public support, or demonstrate success on a small scale, he must first locate five local residents willing to become publicly identified sponsors. That creates a circular barrier.

Appellant sought to "win small" in order to build the support necessary eventually to "win big," but the five-sponsor requirement prevents him from even beginning the smaller initiatives that were supposed to create that broader support.

In other words, the law demands the existence of an organized local constituency before Appellant may use the initiative process to build one.

**D. A loud public meeting does not establish the electorate's view.**

As shown in Exhibit O, controversial local proposals frequently produce highly visible opposition. A crowded city-council or county-commission meeting may demonstrate that a motivated group strongly opposes a proposal. It does not establish how the entire electorate would vote. One central function of an initiative process is to allow the electorate itself to decide whether an issue has enough support to proceed. Nevada's rule can prevent that question from ever being asked. The statute measures willingness to accept public identification before it permits measurement of electoral support.

**E. The Court cannot treat the absence of five public local sponsors as proof of insufficient support, when the law itself excludes willing Nevada proponents.**

This is particularly important where willing Nevada residents outside the locality exist. The district court cannot logically argue that the inability to assemble five local public sponsors proves lack of grassroots interest, when the challenged laws simultaneously prohibit otherwise willing Nevada electors from initiating the process.

The rule does not ask: "Will enough local voters sign?" Nevada separately answers that through the signature threshold. The rule asks: "Can five identifiable local people be persuaded to become public sponsors before anyone else is allowed to sign?"

Those are different questions.

**F. The statutes threatens controversial reform precisely where direct democracy may be most important.**

The statutes' burden falls most heavily on proposals that are new, stigmatized, controversial, or politically disfavored by established local organizations. Conventional proposals backed by existing civic, religious, industry, or political organizations can locate several public proponents from within their own networks. An emerging or unpopular-with-organized-groups proposal may have private voter support but no established group of five willing public sponsors.

**V. THE REMAINING PRELIMINARY-INJUNCTION FACTORS FAVOR RELIEF.**

**A. Appellant Is Likely to Succeed on the Merits Because the District Court Applied the Wrong Legal Framework.**

*Winter* requires a plaintiff seeking preliminary relief to establish likelihood of success on the merits, likely irreparable harm, favorable equities, and consistency with the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The likelihood-of-success factor favors Appellant because the district court's denial rested on legal errors in its interpretation and application of controlling Ninth Circuit precedent.

First, the district court treated *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015) (en banc), as effectively controlling even though *Chula Vista* expressly framed the challenged

exclusion as one preventing corporations and associations from serving as official proponents. Appellant is a natural Nevada voter, and Nevada imposes the additional requirement that five local electors publicly sponsor a petition before circulation may begin. California's challenged law allowed at least one proponent.

Second, the district court misapplied *Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022). *Pierce* held that lack of evidence showing actual ballot-access failure is not dispositive, that courts must consider all effects of a residency restriction, and that such restrictions may severely burden the rights of in-state initiative proponents. The reconsideration order further misread *Pierce*'s discussion of resident official proponents as establishing that such restrictions are categorically permissible, even though that discussion arose only after strict scrutiny had already attached and concerned less restrictive means of protecting Montana's asserted self-government interest.

Third, the district court misapplied *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012), by treating a post-circulation geographic-distribution requirement governing actual petition signatures as analogous to a pre-circulation rule that prevents voters from signing at all until five public sponsors are obtained. *Angle* concerned how demonstrated voter support could be measured. Nevada's five-sponsor rule determines whether voter participation may begin.

Fourth, the district court supplied a "grassroots support" rationale for the five-person committee without examining the provision's apparent Model City Charter borrowing, Nevada's 1967 adoption of the same five-person committee and separate fifteen-percent signature structure, or any legislative history showing that the number five was intended to measure political support. The State did not appear and supplied no contrary legislative explanation.

These errors concern the legal framework governing the challenged statutes, not merely competing factual inferences. A district court abuses its discretion when it rests a preliminary-injunction ruling on an erroneous view of law. *See Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023); *Baird v. Bonta*, 81 F.4th 1036, 1040–41 (9th Cir. 2023).

Under the correct framework, Appellant has demonstrated a likelihood of success on his First Amendment claim. Nevada's law categorically excludes willing Nevada electors residing outside the locality, requires five local residents to assume public sponsorship before circulation may begin, and prevents any voter signatures from being collected unless that threshold is first satisfied. The record further demonstrates that this burden has repeatedly prevented Appellant from circulating initiatives, despite years of effort and private local support.

The Court therefore need not limit its conclusion to the existence of "serious questions." It may hold that Appellant has demonstrated likelihood of success on the merits and that the district court's contrary conclusion rested on legal error.

**B. Appellant Has Already Lost Three Election Cycles, and Without Injunctive Relief the Same Barrier Threatens the 2028 Cycle.**

The challenged statutes have not caused Appellant one missed electoral opportunity. They have repeatedly prevented him from reaching the circulation stage. Appellant's Third Amended Complaint alleges that the five-elector requirement blocked his local initiative efforts in **2022, 2024, and 2026**. Third Am. Compl. ¶ 51, ECF No. 28.

Those three election cycles are gone. No later judgment can restore the signatures Appellant could have collected, the political discussion that could have occurred, the local campaigns that could have developed, or the opportunities to place those measures before Nevada voters in 2022, 2024, or 2026.

Appellant is now preparing for the 2028 election cycle. Unless the five-person requirement is enjoined, the same injury threatens to recur for a fourth cycle. The underlying barrier has not changed. Appellant continues to encounter residents who may privately support legalization, sign a petition, or vote for reform, but who are unwilling to publicly identify themselves as official sponsors because of reputational, employment, social, or community consequences. Id. ¶¶ 25–27, 41–52.

Without five public sponsors, Appellant cannot circulate. Without circulation, he cannot collect signatures, recruit supporters through the petition process, build a campaign organization, or attempt to qualify his measures for the ballot. Thus, the continuing enforcement of the statutes threatens the same result in 2028 that

occurred in the preceding three cycles: private support may exist, but voters cannot demonstrate that support through petition signatures because five local residents will not first assume the separate burden of public sponsorship.

The record also demonstrates that ordinary political channels have not supplied a substitute. After encountering the five-sponsor barrier in West Wendover, Appellant sought an advisory ballot question so voters could express their views without requiring five residents to become public initiative sponsors. The City did not provide that alternative. Third Am. Compl. ¶¶ 38–40 & Ex. H, ECF No. 28. Appellant's communications with West Wendover officials specifically explained that residents had expressed support but feared harassment or public exposure from attaching their names to the initiative process. Ex. H, ECF No. 28.

The injury is cumulative. Appellant's strategy has been to begin with smaller Nevada communities, demonstrate that reform can succeed locally, and use those successes to build support for broader reform. Each lost cycle therefore delays not merely one proposed election, but the political development that earlier local successes were intended to produce. Appellant sought to win small before attempting to win big. The challenged statutes have prevented him from winning small at all.

The loss of First Amendment freedoms, even for limited periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Here, the deprivation has already persisted across three election cycles. Election deadlines make that injury particularly concrete because expired qualification periods cannot later be recreated. The Court cannot return Appellant to the 2022, 2024, or 2026 petition cycles, and relief arriving after the relevant 2028 qualification deadlines would similarly come too late.

Preliminary relief is therefore necessary to prevent a continuing constitutional injury from consuming a fourth election cycle.

**C. The balance of equities favors a narrow injunction.**

Appellant does not seek to dismantle Nevada's initiative system. He challenges the five-person/locality initiation barrier as applied to his local initiative efforts. Nevada would retain:

- signature requirements;
- signature verification;
- filing deadlines;
- circulator affidavits;
- fraud laws;
- election-administration provisions;
- local voting requirements;
- ballot-qualification standards.

Allowing circulation to begin does not place a proposal on the ballot. It allows the electorate to determine, through signatures, whether enough grassroots support exists to proceed.

**D. The Public Interest Favors Protecting the Ability of Individuals to Pursue Political Reform Born From Their Own Lives and Experiences.**

Appellant believes deeply in the reforms he seeks. His advocacy is not random. His own life experiences, including living with Moebius Syndrome, shaped both his political perspective and the path that ultimately led him to advocate for reform of Nevada's legal sex-work system. The Third Amended Complaint specifically explains that Appellant's disability affects his speech and political outreach and has required him to rely more heavily on written communication and third-party volunteers. Third Am. Compl. ¶¶ 34–37, 107, ECF No. 28.

Appellant does not regard the subject of legal sex work as "taboo." The district court used that characterization. Appellant instead regards reform of Nevada's legal brothel system as a legitimate political cause involving autonomy, access, safety, economic opportunity, and the treatment of people who may experience intimacy and social life differently from others.

The First Amendment protects the ability of citizens to translate their own experiences into political advocacy. As the Supreme Court observed in *Lawrence v. Texas*, liberty protects an individual's ability to make choices central to personal dignity and autonomy and to "define one's own concept of existence." 539 U.S. 558, 574 (2003) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992)). *Lawrence* further

recognized that adults may seek autonomy in matters involving personal relationships and private life. Id. at 567, 578.

That principle has special relevance here, not because *Lawrence* itself decides the constitutionality of Nevada's initiative statutes, but because it illustrates why political advocacy concerning intimacy, sexuality, and personal autonomy is not somehow less worthy of public participation, merely because others regard the subject as uncomfortable.

Nor is the statute problem limited to Appellant's particular proposals. The same five-person public-sponsorship requirement may burden local initiatives concerning abortion, LGBTQ rights, cannabis, firearms, reproductive policy, or other controversial subjects, whenever residents privately support a measure but are unwilling to become publicly identified sponsors.

The public interest therefore lies in preserving a meaningful avenue for citizens to introduce political reforms that arise from their own lives, values, and experiences. Nevada already requires substantial local voter signatures before an initiative can qualify. If a proposal lacks support, that requirement will expose the absence of support. If sufficient voters sign, the electorate may ultimately accept or reject the proposal.

But the public interest is not served by preventing the electorate from ever reaching that stage because five residents are unwilling to become public sponsors of an idea that others may nevertheless be willing to sign for and vote upon.

The initiative process should permit citizens to attempt to change the law, including citizens whose experiences lead them to challenge established institutions, entrenched practices, or prevailing social attitudes. That is precisely the kind of political participation the First Amendment exists to protect.

## VI. THE EQUAL-PROTECTION AND NEVADA-CONSTITUTION CLAIMS SHOULD BE RECONSIDERED UNDER THE CORRECT FIRST AMENDMENT FRAMEWORK.

### A. Even Under Rational-Basis Review, Nevada's One-Proponent Statewide Rule and Five-Proponent Local Rule Lack a Rational Relationship to the Interests Identified Below.

Nevada law treats similarly situated Nevada electors differently depending on the geographic scope of the initiative they seek to sponsor. A single elector may sponsor a statewide initiative under NRS 295.015(1), while a city or county initiative requires five local electors under NRS 295.095(1) and NRS 295.205(1). Third Am. Compl. ¶¶ 140–42, ECF No. 28.

That disparity is not hypothetical as to Appellant. Appellant is a natural person, Nevada resident, registered voter, and therefore a qualified Nevada elector. Nevada law considers one qualified elector sufficient to initiate a statewide measure capable of changing the law throughout the entire State. Yet that same Nevada elector is legally insufficient to initiate a measure affecting only one Nevada locality, unless five electors residing in that locality publicly join the effort.

Even assuming rational-basis review applies, that inversion requires some rational relationship to a legitimate governmental purpose. See *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993). The record gives none.

The district court identified local self-government and grassroots support as interests supporting the local restrictions. ECF No. 23 at 8–9. But requiring five proponents locally, while requiring only one statewide, does not rationally track either interest. If one Nevada elector is sufficient to initiate legislation affecting every Nevada city and county collectively, it is difficult to explain why five electors are necessary merely to begin circulation of a measure affecting one locality. The disparity runs opposite the scope of the proposed governmental action: the broader statewide measure requires fewer proponents, while the narrower local measure requires more.

Nor does the five-person requirement rationally measure grassroots support. Nevada separately requires local initiative petitions to obtain signatures from fifteen percent of the relevant local electorate. Nev. Rev. Stat. §§ 295.095(2), 295.205(2). Those signatures directly measure whether local voters support advancing the proposal. The five-person prerequisite instead measures whether five individuals are willing to assume the distinct burden of public sponsorship before circulation begins.

The historical structure further undermines any assumption that five was selected because five sponsors demonstrate political legitimacy. As discussed above, Nevada's 1967 local-initiative provisions closely track the Model City Charter framework, pairing a five-person petitioners' committee with a separate fifteen-percent signature requirement. See Act of Mar. 24, 1967, ch. 186, §§ 4, 11, 1967 Nev. Stat. 378, 378–82; Nat'l Mun. League, *Model City Charter* art. VIII, §§ 8.02–.03 & commentary, at 28 (5th ed. 1941, 7th printing 1957). The Model City Charter commentary explains that the petitioners' committee exists to place "clear responsibility" for undertaking the initiative process, while the following section separately addresses the number of signatures required. Id.

Nothing in the record explains why Nevada imported that five-person municipal committee structure for local initiatives, while permitting a single proponent for statewide initiatives. The State never appeared during the preliminary-injunction proceedings and therefore supplied no legislative history, testimony, or policy explanation addressing the disparity.

The residency component produces an additional irrationality as applied to Appellant. Appellant is not an out-of-state political actor attempting to enter Nevada's initiative process from another state. He is already a Nevada elector and a member of Nevada's political community. Nevada nevertheless treats him as sufficiently connected to initiate a measure affecting the entire State, yet insufficiently connected to initiate a measure in a single Nevada locality, unless five residents of that locality publicly sponsor it.

Local control is already preserved through the later stages of the process. Only the relevant local electorate can supply the required local signatures, and only the relevant voters can ultimately approve the measure. Allowing a Nevada elector to commence circulation therefore does not permit him to enact local law or override local voters. It merely permits those voters to decide whether enough local support exists to advance the proposal.

The classification challenged here therefore does not rationally correspond to the governmental interests invoked below. Nevada treats one qualified elector as sufficient for statewide lawmaking initiation, but demands five for local initiation, even though the local electorate retains complete control over qualification and

adoption. The historical sources indicate that the number five derives from an administrative committee model, not from a judgment that five persons represent greater grassroots legitimacy.

For those reasons, even under rational-basis review, the one-versus-five distinction lacks a rational relationship to the interests identified by the district court and should not be sustained merely because the local process has historically used a five-person committee.

**B. Article 19 independently reinforces the importance of access to Nevada's initiative process.**

Article 19 reserves initiative power to the people of Nevada. Appellant's Third Amended Complaint alleges that the five-person requirement is not merely a procedural rule governing how signatures are verified or ballots administered, but a substantive gate determining whether the initiative process may begin at all.

As stated in his TAC, Appellant relies on *People ex rel. Angle v. Miller*, 192 P.3d 1166 (Nev. 2008), for the principle that procedural regulations may facilitate but may not directly inhibit Nevada's reserved initiative power. The district court treated the Nevada constitutional analysis as materially parallel to its First Amendment analysis. Accordingly, if the federal burden analysis was legally erroneous, the Article 19 claim should likewise be reconsidered on remand.

**VII. CONCLUSION**

For the foregoing reasons, Appellant respectfully requests that this Court:

1. **reverse or vacate the March 3rd, 2026 order denying preliminary injunctive relief;**
2. **reverse or vacate the September 22nd, 2026 order denying reconsideration;**
3. **hold that the district court applied an incorrect legal framework in evaluating NRS 295.095(1) and NRS 295.205(1), including by misapplying *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, *Angle v. Miller*, and *Pierce v. Jacobsen*;**
4. **hold that Appellant has demonstrated a likelihood of success on the merits and that the remaining preliminary-injunction factors favor relief;**

5. **remand with instructions to enter appropriate preliminary injunctive relief preventing enforcement of the five-person local-sponsorship requirement against Appellant while this action proceeds;** and
6. **alternatively, if this Court concludes that additional district-court proceedings are necessary, remand with instructions to reconsider preliminary injunctive relief under the correct constitutional framework and consistent with this Court's holdings.**

Respectfully submitted,

**Russell Greer**

Date: November 25, 2026

## VIII. STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellant is unaware of any related case presently pending in this Court within the meaning of that rule.

## IX. CERTIFICATE OF COMPLIANCE

I certify that I am an unrepresented litigant and that this opening brief complies with Ninth Circuit Rule 32-1(f), which permits an opening brief filed by an unrepresented litigant to contain up to 50 pages and under 14,000 words.

This brief contains 44 pages subject to the applicable length limitation, excluding the table of contents, table of authorities, and other portions excluded from the page calculation.

For informational purposes, this brief contains approximately 11,050 words, excluding the table of contents and table of authorities.

I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6).

/s/ Russell Greer
Russell Greer
Appellant, Pro Se



**STATEMENT REGARDING SERVICE AND THE STATE'S NONAPPEARANCE**

Appellant has been unable to obtain substantive participation from the State despite service.

According to the process server's return, the Nevada Attorney General was served on October 8th, 2026.

The Office of Nevada Secretary of State Francisco Aguilar separately confirmed in September 2026 that service had been properly received.

Despite confirmed service, the State did not appear in the district court, did not file an opposition to Appellant's motion for preliminary injunction, and did not provide substantive briefing defending the challenged statutory provisions. Appellant has continued attempting to obtain a response from the State but has received no substantive response.

As a result, the district court evaluated the constitutionality of the challenged provisions without adversarial briefing from the State concerning the purpose, legislative history, or justification for the five-person local sponsorship requirement.

## CERTIFICATE OF SERVICE

I declare that I served a copy of this Brief by ECF on November 25th, 2026.

Respectfully submitted,

/s/ Russell Greer

Russell Greer

11-25-26

